**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRIAN SCOTT ZUCKERMAN,** | |
| *Plaintiff,* | |
| v. | **Case No. 2:22-cv-01993-JDW** |
| **FORT DEARBORN INSURANCE COMPANY,** *et al.,* | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

Brian Scott Zuckerman was diagnosed with follicular lymphoma in September of 2020, and he claims that he was no longer able to perform all his job duties once he started receiving chemotherapy the following month. Eventually, Mr. Zuckerman stopped working altogether, but his employer continued to pay him in full for months thereafter. This undisputed fact made him ineligible for long-term disability benefits under the governing plan, and the plan's administrator is entitled to summary judgment as a result.

## I.   BACKGROUND

### A.   The Plan

Mr. Zuckerman is a principal of Domus, Inc., which sponsored a Long Term Disability Plan (Plan No. F018606-0001) (the "Plan") funded by a group insurance policy with Fort Dearborn Life Insurance Company ("Dearborn") from August 1, 2012, until

November 30, 2020. Domus was the designated Plan Administrator but delegated its administrative duties to Dearborn, including the responsibility to determine employees' eligibility for benefits under the Plan. Pursuant to the terms of the Plan, Dearborn, as the Plan Administrator, "has full discretionary authority and control over the Plan." (AR00000013.)[1]

An insured must qualify as disabled under the Plan to qualify for long-term disability ("LTD") benefits. The "Date of Disability" is the date Dearborn determines that an insured is "Disabled." In turn, "Disability" or "Disabled" means that the insured "satisfy[ies] the definition of either Total Disability or Partial Disability." (AR00000042.) Under the Plan, "Total Disability" or "Totally Disabled" means that:

> [D]uring the first 24 consecutive months of benefit payments due to Sickness or Injury;
>
> > 1.   [The insured is] continuously unable to perform the Material and Substantial Duties of [his] Regular Occupation, and
> >
> > 2.   [The insured's] Disability Earnings, if any, are less than 20% of [his] pre-disability Indexed Monthly Earnings.
>
> After the LTD Monthly Benefit has been paid for 24 consecutive months, Total Disability or Totally Disabled means that due to Injury or Sickness:
>
> > 1.   [The insured is] continuously unable to engage in any Gainful Occupation, and
> >
> > 2.   [The insured's] Disability Earnings, if any, are less than 20% of [his] pre-disability Indexed Monthly Earnings.

---

[1]   All citations to "AR_" refer to the Administrative Record, which appears on the docket at ECF No. 53.

(AR00000025.) Somewhat different, "Partial Disability" or "Partially Disabled" means that:

1. During the Elimination Period [the insured is] unable to perform all of the Material and Substantial Duties of [his] Regular Occupation.

2. During the first 24 consecutive months of benefit payments, due to Injury or Sickness [the insured is] unable to perform all of the Material and Substantial Duties of [his] Regular Occupation, and [his] Disability Earnings, if any, are at least 20% but less than or equal to 80% of [his] pre-disability Indexed Monthly Earnings.

3. After the LTD Monthly Benefit has been paid for 24 consecutive months Partial Disability or Partially Disabled means that due to Injury or Sickness, [the insured is] unable to engage in any Gainful Occupation; and [his] Disability Earnings, if any, are at least 20% but less than or equal to 60% of [his] pre-disability Indexed Monthly Earnings.

(*Id.*)

An insured does not start collecting benefits as of the Date of Disability. Instead, the insured is subject to an "Elimination Period" that begins on the Date of Disability and continues for 90 days. "The *Elimination Period* is a period of continuous *Disability* which must be satisfied before [an insured is] eligible to receive benefits from [Dearborn]." (*Id.*) Because the Plan terminated as of November 30, 2020, Dearborn would not cover a disability that arose after that date.

**B.    Mr. Zuckerman's Claim For LTD Benefits**

Mr. Zuckerman's physician diagnosed him with follicular lymphoma in September 2020. Mr. Zuckerman had his first chemotherapy treatment on October 26, 2020, and he claims that he stopped going to work on January 15, 2021. When he first spoke with a

Dearborn representative, Mr. Zuckerman advised that "he thinks he missed 7 or 8 days" of work between the time he started receiving chemotherapy treatments and his last day of work. (AR00000076.) On another call with Dearborn a few days later, Mr. Zuckerman reported that after his first treatment, "he didn't work at all" for two-and-a-half weeks and "[o]nly worked 2 or 3 days in November." (AR00000073.) He also reported that he "couldn't work at all" after his third chemotherapy treatment on December 28, 2020, but his insurance broker (who was also on the call) stated that Mr. Zuckerman worked part-time until January 15, 2021. (AR00000074.) There is no documentation confirming if (or when) Mr. Zuckerman did not work because Domus did not track his sick and vacation days. In addition, Domus continued to pay Mr. Zuckerman his regular weekly salary until May 2021.

On July 21, 2021, Mr. Zuckerman submitted a claim for LTD benefits under the Plan. As part of the claims review process, Mr. Zuckerman submitted two Attending Physician Statements ("APS") from Dr. Sundee Gable. Dr. Gable did not treat Mr. Zuckerman during the period between his first chemotherapy treatment in October 2020 and when he stopped working in January 2021. In his first APS from May 2021, Dr. Gable opined that Mr. Zuckerman was disabled as of January 5, 2021, around the time he stopped working. However, in his second APS in September 2021, Dr. Gable stated that Mr. Zuckerman was disabled as of October 20, 2020.

On November 4, 2021, Dearborn denied Mr. Zuckerman's claims for benefits, explaining that Mr. Zuckerman did not qualify as disabled under the Plan before the Plan terminated on November 30, 2020. Mr. Zuckerman appealed that decision. Dearborn then enlisted Dr. Karen Hoelzer Vilcinskas to conduct an independent medical file review. Dr. Vilcinskas determined that Mr. Zuckerman "could and did work intermittent part-time through his last work date of [January 15, 2021]" and noted that "[i]ntermittent part-time work capacity is reasonable for claimants undergoing the type of treatment Mr. Zuckerman received" during that time. (AR00000612.)

On March 31, 2022, Dearborn completed its review of Mr. Zuckerman's appeal and upheld its decision denying him LTD benefits under the Plan because it determined that Mr. Zuckerman "did not meet the definition of disability prior to his employer, Domus, Inc. terminated [sic] their LTD Policy effective November 30, 2021 [sic]." (AR00000620.) As part of its appeal decision, Dearborn noted that "[t]he documentation in Mr. Zuckerman's claim file does not provide documentation [sic] Mr. Zuckerman missed a full or partial day from work" on the dates he received chemotherapy or "any other dates" and that Dearborn could not confirm that he was absent from work until February 24, 2021. (AR00000626.)

On May 20, 2022, Mr. Zuckerman filed suit, alleging that Dearborn violated the Employee Retirement Income Security Act of 1974 by denying his claim for LTD benefits.

The Parties filed cross-motions for summary judgment on the administrative record, and those motions are ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A)-(B). If he fails to make this showing, then the court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

The filing of cross-motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing

party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* (quotation omitted). Rather, "[w]hen confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), *aff'd*, 435 F.3d 431 (3d Cir. 2006).

## III.   ANALYSIS

Under ERISA, a district court's review of a denial of benefits is *de novo*, "'unless the benefit plan gives the administrator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]' in which case courts review those determinations for abuse of discretion." *Mullins v. Consol Energy, Inc. Long Term Disability Plan*, No. 22-2930, --- F.4th ----, 2024 WL 3564555, at *3 (3d Cir. Mar. 22, 2024) (quotation omitted). In this context, "the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Id.* (same). Thus, "a decision is arbitrary and capricious only 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Id.* (same). "'Substantial evidence' is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (same).

There is no dispute that the Plan granted Dearborn the discretion to determine whether Mr. Zuckerman is eligible for LTD benefits. Thus, I review Dearborn's decision for abuse of discretion. In doing so, I must not substitute my own judgment for that of

Dearborn, and I cannot disturb Dearborn's decision if the decision was reasonable. *See id.* That Dearborn may have a financial conflict—as an insurer that both evaluates and pays benefits claims—does not alter the standard of review. *See Dowling v. Pension Plan For Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 250 (3d Cir. 2017) (quotation omitted). Instead, whether (and to what extent) a conflict exists is "just another 'factor'" that courts consider when determining whether a denial of benefits was lawful. *Id.* (same).

### A.     Substantial Evidence Supports Dearborn's Decision To Deny Benefits

The Parties agree that to be eligible for LTD benefits under the Plan, Mr. Zuckerman needed to demonstrate—at a minimum—that he was "Disabled" before the Plan terminated on November 30, 2020. It's no wonder, then, that the Parties spend most of their time disputing whether and when Mr. Zuckerman's disability arose. However, even if Mr. Zuckerman is correct that he was disabled as of October 2020, it does not make a difference, because substantial evidence supports Dearborn's ultimate determination that he is not entitled to benefits under the Plan.

The fact that Mr. Zuckerman was diagnosed with lymphoma is not dispositive because "the fact that the plaintiff has been diagnosed with a condition does not equate to proof that [he] is totally disabled from any occupation as a result of that condition." *See Krash v. Reliance Standard Life Ins. Co.*, 248 F. Supp. 3d 600, 614 (M.D. Pa. 2017), *aff'd*, 723 F. App'x 106 (3d Cir. 2018). Instead, an insured like Mr. Zuckerman will qualify as

disabled or have a disability if he satisfies the Plan's definition of either Total Disability or Partial Disability.

Unlike the definition of Total Disability, an insured can be considered Partially Disabled during the Plan's Elimination Period without regard for his earnings during that time. The only requirement during that time is that the insured be "unable to perform all of the Material and Substantial Duties of [his] Regular Occupation." (AR00000025.) The Elimination Period begins on the Date of Disability and lasts for 90 days, and this period "must be satisfied" before an insured is eligible to receive LTD benefits. (*Id.*) As such, Dearborn does not pay benefits during the Elimination Period. Once that period is over, the insured's earnings must be "less than or equal to 80% of [his] pre-disability Indexed Monthly Earnings" "[d]uring the first 24 consecutive ***months of benefit payments***" to qualify as Partially Disabled. (*Id.* (emphasis added).) To qualify as Totally Disabled, the insured's Disability Earnings must be "less than 20% of [his] pre-disability Indexed Monthly Earnings" "during the first 24 consecutive ***months of benefit payments*** due to Sickness or Injury." (*Id.* (same).)

Even if Mr. Zuckerman was Partially Disabled as of October 20, 2020 (as he contends), he would have been subject to the Plan's 90-day Elimination Period. By the time the Elimination Period would have ended on or about January 18, 2021, Mr. Zuckerman would not qualify as disabled—either totally or partially—because he

9

continued to earn 100% of his pre-disability Monthly Earnings until May 2021.[2] That outcome would be the same even if Dearborn determined Mr. Zuckerman to be Partially Disabled as of the last day the Plan covered him—November 30, 2020.

In his opposition to Dearborn's motion for summary judgment, Mr. Zuckerman does not address—at all—Dearborn's lead argument that he could not be Totally or Partially Disabled under the Plan because he continued to receive 100% of his pre-disability earnings until May 2021. Instead, in his opening brief, he just contends that "[i]t seems incredible that Mr. Zuckerman would have to go without any sort of income whatsoever for an extended period of time to be eligible for benefits under" the Plan. (ECF No. 49 at 25.) The Plan doesn't require insureds to "go without any sort of income whatsoever" in order to qualify as Totally or Partially Disabled. Indeed, an insured could continue to earn something less than 20% of his pre-disability Monthly Earnings and be considered Totally Disabled or earn between 20% and 80% of his prior earnings and be considered Partially Disabled. The Plan is not unique in this regard. The entire purpose of LTD benefits is to help employees close the gap when a disability prevents them from working and earning their full salary. But if an employee continues to collect his/her full salary despite having a disability, then there is no gap to close. Because it is undisputed that Domus continued to pay Mr. Zuckerman his regular weekly salary until May 2021,

---

[2]     The Plan defines "Monthly Earnings" as Mr. Zuckerman's "gross monthly income from [Domus] in effect just prior to [his] Date of Disability." (AR00000026.)

there was substantial evidence to support Dearborn's conclusion that Mr. Zuckerman was not eligible for LTD benefits under the Plan.

Mr. Zuckerman also does not explain why it matters whether Dearborn "failed in any way to perform any proper investigation as to the method, basis and/or explanation as to why [he] was receiving a payroll draw during this crisis." (ECF No. 49 at 25.) To the extent Mr. Zuckerman intended to suggest that the payments were something other than his regular salary and did not qualify as his "gross monthly income from [his] Employer in effect just prior to [his] Date of Disability[,]" (ECF No. 53 at 29), that vague and undeveloped argument is not convincing. Mr. Zuckerman admitted that he "continued to receive full pay" from September 1, 2020, to May 2021 and that Domus confirmed that his continued weekly pay of $9,615.39 was for "regular hours ...." (ECF No. 54 at ¶¶ 26-27.) This information, along with payroll records showing that Domus paid this exact amount to Mr. Zuckerman every week, is substantial evidence that Mr. Zuckerman continued to receive 100% of his Monthly Earnings until May 2021. Thus, he could not meet the definition of Total or Partial Disability, regardless of whether he could perform his job duties. Nothing about the payroll records or related evidence would have caused Dearborn to question whether the weekly payments were "bonuses, overtime pay, or any other extra compensation, or income received from sources other than" Domus that would not constitute Monthly Earnings under the Plan. (AR00000026.) As such, Dearborn

did not abuse its discretion in failing to investigate the method or bases for these payments.

Finally, the mere fact that Dearborn might have a financial conflict as both the Plan administrator and payor of benefits is not enough for me to determine that it abused its discretion in denying Mr. Zuckerman's claim for LTD benefits. The Third Circuit has "only been willing to disturb an administrator's decision based on a conflict of interest if evidence either suggests the conflict actually infected the decisionmaking or if the conflict is one last straw that calls a benefits determination into question." *Dowling v. Pension Plan For Salaried Emps. of Union Pac. Corp. & Affiliates*, 871 F.3d 239, 251 (3d Cir. 2017). Neither is true here. As such, I will deny Mr. Zuckerman's motion for summary judgment and grant summary judgment in favor of Dearborn.

## IV.    CONCLUSION

Long-term disability insurance is premised on a need to replace lost wages due to an employee's disability. But Mr. Zuckerman received his full pay for many months, rendering him not disabled as defined in the Plan, and therefore ineligible for LTD benefits. Substantial evidence supported Dearborn's decision to deny his claim for benefits, so Dearborn is entitled to summary judgment, absent any evidence that it abused its discretion in rendering its decision. An appropriate Order follows.

BY THE COURT:

*/s/ Joshua D. Wolson*

August 7, 2024                    **JOSHUA D. WOLSON, J.**